UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


DEBORAH LAIRD,

              Plaintiff,                      CIVIL ACTION NO. 08-13075

          v.                        DISTRICT JUDGE NANCY J. EDMUNDS

METLIFE LIFE AND ACCIDENT       MAGISTRATE JUDGE VIRGINIA M. MORGAN
INSURANCE COMPANY,

              Defendant.
_____/

## REPORT AND RECOMMENDATION

### I. Introduction

      This Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.* (2000), case comes before the court on Plaintiff's Motion for Judgment Reversing Defendant's Decision to Terminate Long Term Disability Benefits (D/E #12) and Defendant's Motion to Affirm Administrator's Decision and for Entry of Judgment Based on the Administrative Record (D/E #16). For the reasons stated below, the court recommends that plaintiff's motion be denied, defendant's motion be granted, and judgment entered in favor of defendant.

## II. Background

### A. Procedural History

Plaintiff worked for TRW Automotive as a machinist and was covered by the TRW Automotive Disability Income Insurance Long Term Benefit Plan ("Plan").  Defendant is the Claims Administrator under the Plan.

On July 16, 2008, plaintiff filed the complaint in this matter (D/E #1).  In that complaint, brought pursuant to ERISA, plaintiff alleges that defendant breached the terms of the employee benefits plan and its fiduciary duties by terminating plaintiff's long term disability benefits after twenty-four months.  Plaintiff also alleged in Count III of her complaint that defendant failed to provide plaintiff with procedural due process.

On December 4, 2008, plaintiff filed a Motion for Judgment Reversing Defendant's Decision to Terminate Long Term Disability Benefits (D/E #12).  In that motion, plaintiff argues that defendant arbitrarily and capriciously terminated plaintiff's benefits based on the opinions of hired medical experts who performed only incomplete record reviews.  She argues that defendant should have relied on the opinions of plaintiff's longtime treating physicians who stated that plaintiff remained completely disabled from employment as the result of an organic brain disease.  In support of that argument, plaintiff also noted that defendant failed to conduct a medical examination of plaintiff, despite having the right to do so, and that the Social Security Administration found plaintiff to be completely disabled.  Plaintiff further argued that defendant had a conflict of interest given that it is both the Plan administrator and the Plan funder, and that

any limitations and exclusions in the Plan should be construed against defendant because defendant is the insurer.

On December 23, 2008, defendant filed a Motion to Affirm Administrator's Decision and for Entry of Judgment Based on the Administrative Record (D/E #16). In that motion, defendant argues that its determination regarding plaintiff's long term disability benefits was neither arbitrary nor capricious because there is no objective evidence suggesting that plaintiff suffered from an organic brain syndrome and defendant reasonably relied on its consulting experts. Defendant also argues that the fact that plaintiff was awarded Social Security Disability Insurance benefits is not determinative on the question of whether defendant's decision was arbitrary and capricious. Defendant further argued that it had discretion in interpreting any ambiguous language and, consequently, the doctrine of *contra proferentum* does not apply to this case. With respect to plaintiff's claim that defendant breached its fiduciary duty, defendant argues that, regardless of how plaintiff's counts are labeled, this claim is one to recover pension benefits under ERISA § 502(a)(1) and therefore plaintiff cannot maintain any claims for equitable relief.[1]

On January 13, 2009, plaintiff filed a Response to Defendant's Motion to Affirm Administrator's Decision (D/E #21). In that response, plaintiff makes several arguments. She argues that (1) the court should not defer to *post-hoc* rationales for denying benefit claims when

---

[1]On same day it filed its Motion to Affirm the Administrator's Decision, defendant also filed a Response to Plaintiff's Motion for Judgment (D/E #17). However, defendant merely responds paragraph by paragraph to plaintiff's motion in the two-page response and defendant did not file a brief in support of its response.

those rationales did not appear in the denial letters in the administrative record, (2) there is an actual and readily apparent conflict of interest in this case, (3) the argument that a traumatic brain injury is not an organic brain disease has no basis in fact, and (4) plaintiff suffered a traumatic brain injury/closed head injury as a result of the motor vehicle accident.  Plaintiff also argues that she has submitted objective evidence in support of her disability due to her traumatic brain injury although such evidence is not required under the policy or ERISA §502(a)(1)(B).

On January 26, 2009, defendant filed a Reply to Plaintiff's Response to Defendant's Motion to Affirm Administrator's Decision (D/E #24).  In that reply, defendant argues that the administrative record does not support the view that plaintiff suffered a traumatic brain injury and defendant's independent medical consultants opined that plaintiff's disability did not arise from an organic brain syndrome.

On February 18, 2009, this court held a hearing on plaintiff's Motion for Judgment and defendant's Motion to Affirm Administrator's Decision .

### B.  Factual Background

Under the terms of the Plan:

> **Disabled** or **Disability** means that, due to Sickness or as a direct result of accidental injury:
>
> • You are receiving Appropriate Care and Treatment and complying with the requirements of such treatment, and
>
> • You are unable to earn:
>
>> • during the Elimination Period and the next 6 months of Sickness or accidental injury, more than 80% of Your Predisability Earnings at Your Own Occupation from any employer in Your Local Economy; and

> • after such period, more than 60% of your Predisability Earnings from any employer in Your Local Economy at any gainful occupation for which You are reasonably qualified taking into account Your training, education and experience. [AR 25 (emphasis in original)]

Additionally, the Plan limited long term disability benefits for disabilities due to mental or nervous disorders or diseases:

**For Disability Due to Mental or Nervous Disorders or Diseases**

If you are Disabled due to a Mental or Nervous Disorder or Disease, We will limit Your Disability benefits to a lifetime maximum equal to the lesser of:

• 24 months, or
• the Maximum Benefit Period.

This limitation will not apply to a Disability resulting from:

• schizophrenia;

• dementia; or

• organic brain syndrome.

**Mental or Nervous Disorder or Disease** means a medical condition which meets the diagnostic criteria set forth in the most recent edition of the Diagnostic and Statistical Manual Of Mental Disorders as of the date of Your Disability. A condition may be classified as a Mental or Nervous Disorder regardless of its cause. [AR 46 (emphasis in original)]

Since at least February 7, 1994, plaintiff has been seen and treated by Dr. Gerald Riess, neurologist. (AR 289) Ailments for which Dr. Riess treated plaintiff over the years include restless leg syndrome, headaches, and fibromyalgia. (AR 250-289) On July 23, 2004, plaintiff was seen by Dr. Riess for reevaluation of plaintiff's restless leg syndrome, mixed type headaches, and fibromyalgia. Plaintiff was on medication and Dr. Riess noted at that time that

plaintiff's symptoms were "extremely well controlled" and that, overall, "this is the best she has done in many years."  (AR 249)

Plaintiff also has a history of treatment for depression since the 1990s.  (AR 282-283, 293, 557)  On January 12, 2005, a Dr. Gabrial[2] at Saint Joseph Mercy Behavioral Services performed a medication review and, at that time, Dr. Gabrial diagnosed plaintiff with dysthymic disorder - DSM-IV 300.4.  (AR 567)  Similarly, progress notes written by Dr. Gabrial on March 18, 2005 and April 15, 2005 also identify plaintiff's diagnosis as dysthymic disorder.  (AR 568-569)

On January 24, 2005, Dr. Riess examined plaintiff again for reevaluation of plaintiff's restless leg syndrome, mixed type headaches, and fibromyalgia.  Dr. Riess found that plaintiff's symptoms were "very well controlled."  (AR 248)

About a month later, on February 28, 2005, plaintiff was involved in a motor vehicle accident.  Plaintiff was taken to an emergency room following the accident, but the emergency room records are not part of the administrative record.  However, the administrative record does contain a subsequent evaluation of plaintiff which describes those records:

> [Saint Joseph Mercy Hospital Livingston's] ER records show that
> Ms. Laird was the restrained driver of a motor vehicle that was
> rear ended on 2/28/05 and she was brought by ambulance in full

---

[2]It is impossible to identify the signature of the doctor who performed the medication review from that form, but plaintiff's brief identifies a Dr. Gabrial as plaintiff's treating psychiatrist at that time and defendant later addresses a request for evaluation to a Dr. Gabriel (AR 554).  However, this court would also note that Dr. Riess' letters identify plaintiff's psychiatrist at the time as both "Dr. Schmidt" and "Dr. Schmitt".  Neither party discusses psychiatric treatment by a Dr. Schmidt or Schmitt in the briefs, and this court will consider Dr. Gabrial as the doctor making the illegible signature.

>spinal precautions.  She complained of mild to moderate mid back and neck pain.  She denied loss of consciousness, striking her head and had a good recall of the accident.  She was alert and oriented although complained of a headache.  Her neurological examination was normal with no reports of nausea, vomiting, changes in speech, visual changes and/or other neurological/head injury symptoms.  A CT scan of the cervical spine revealed degenerative disc disease at multiple levels, C 4-7, but no acute injuries.  She was diagnosed with cervical strain, given skelaxin, and advised to see her primary care physician.  [AR 329]

On March 1, 2005, plaintiff called her primary care physician, Dr. Douglas McLearon, and scheduled an appointment for follow-up to the auto accident.  On March 3, 2005, Dr. McLearon provided plaintiff with a note stating that she had been in an automobile accident, she had been evaluated in the emergency room on February 28, 2005, and that she was scheduled to be seen by Dr. McLearon on March 7, 2005, for a reevaluation to determine her return to work date.  (AR 629)

On March 4, 2005, plaintiff made a request to defendant for short term disability benefits.  In that request, plaintiff stated that she became disabled following a car accident on February 28, 2005, and she identified Dr. McLearon as her treating physician.  She did not identify the nature of her disability in the request.  (AR 626-629)

On March 7, 2005, plaintiff reported to Dr. McLearon for physical exam.  Dr. McLearon diagnosed occipital sprain and spasm, fibromyalgia, and acute myositis.  He referred her to physical therapy for help with her acute muscular injury and restricted her from work until March 28, 2005.  (AR 607, 631, 632)

On March 23, 2005, Dr. Riess examined plaintiff again.  Plaintiff told Dr. Riess that her

speech has been slurred and she has had daily headaches since the accident.  (AR 246)  Dr. Riess

found:

> Mental status is within normal limits for speech, cognition,
> orientation, and memory.  On cranial nerve exam, the pupils are 3
> mm, and equally reactive to light.  Funduscopic exam shows sharp
> disks bilaterally.  Visual fields are full.  Ocular movements are
> full. Facial sensation and musculature are symmetrical.  Auditory
> acuity is within normal limits.  The tongue protrudes and the uvula
> rises midline.  Trapezius power is symmetrical.  Swallowing reflex
> is within normal limits.  Motor exam shows normal bulk, tone, and
> power.  Coordination shows normal rapid repetitive movements.
> Deep tendon reflexes are 2+ throughout.  Gait is within normal
> limits for standard gait.  Sensory exam shows normal light touch.
> [AR 246]

Given those findings, Dr. Riess concluded:

> I feel the patient most likely is experiencing a post concussional
> syndrome.  I would like to obtain an MRI scan of the brain to rule
> out a contusion or other evolving structural lesion.  An EEG to
> look for cortical slowing will also be obtained.  I have referred the
> patient for neuropsychological testing to better define her memory
> problems.  The patient will return to the clinic for reevaluation and
> treatment following these tests.  Ischemia is a restriction in blood
> supply, generally one due to factors in the blood vessels, with
> resultant damage or dysfunction of tissue.  Demyelinating disease
> is any disease of the nervous system in which the myelin sheath of
> neurons is damaged.  This impairs the conduction of signals in the
> affected nerves, causing impairment in sensation, movement,
> cognition, or other functions depending on which nerves are
> involved.  [AR 246]

On March 25, 2005, Dr. McLearon signed an Attending Physician Statement that noted

the diagnosis of physical occipital pain/strain, plaintiff's restrictions from her occupation, and

the referral to neurology and physical therapy.  (AR 612)

On April 2, 2005, Plaintiff underwent an MRI of her brain.  The findings from the MRI

were:

> Normal brain configuration including ventricular size, midline
> position, and cervicomedullary junction.  No intracranial mass
> effect or abnormal contrast enhancement.  Small linear enhancing
> structure consistent with small venous agioma in the upper anterior
> right parietal lobe.  Four or five tiny spots of increased T2 signal in
> cerebral white matter, more conspicuous in the left brain than the
> right.  This represents a slight increase from last MRI of 2/4/04.
> Scattered signal changes of this type are quite nonspecific, but
> common causes include microvascular ischemia and demyelinating
> disease.
>
> IMPRESSION: Scatter tiny foci of altered signal in cerebral white
> matter, representing a slight increase from 2/4/04. Otherwise,
> negative examination with incidental details noted above.  [AR
> 428.]

On April 5, 2005, Dr. Riess performed an electroencephalogram ("EEG") on plaintiff.

The result of the EEG was "[n]ormal awake electroencephalogram."  (AR 427)

On April 19, 2005, Dr. Riess examined plaintiff for revaluation of plaintiff's symptoms

of headaches, memory loss, and generalized aches and pains.  Plaintiff reported she was doing

poorly, had daily headaches, and that she was very anxious and panicky throughout the day.

(AR 244)  Dr. Riess noted that plaintiff's EEG was within normal limits while her "MRI scan

showed scattered small foci of altered signal intensity in the cerebral white matter which was felt

to be slightly more prominent than the previous study of February 4, 2004."  (AR 244)  After the

examination, Dr. Riess stated: "Mental status is within normal limits for speech, cognition,

orientation, and memory."  (AR 244)  Dr. Riess then concluded:

> I feel the patient's symptoms are somewhat worse. I have given her a prescription for Xanax to take 0.5 mg up to t.i.d. for her anxiety. She was also placed on Pamelor to be built up to 50 mg q.hs. Previously this was an effective medication but was only discontinued because her headaches were gone. She was informed that this can cause excess sedation, dry mouth, and weight gain. I have also referred the patient for neuropsychological testing again (this has not yet been done). She will continue to follow up with Dr. Schmitt [sic] (her psychiatrist) and return to the clinic for reevaluation in one month. [AR 244]

On April 5, 2005, defendant approved plaintiff's request for short term disability benefits. Plaintiff's exact disability was not described. The benefits were approved for the time period of March 1, 2005 to March 28, 2005. (AR 610)

On April 26, 2005, Donna DePalma, an MSW at Saint Joseph Mercy Outpatient Behavioral Services, issued a Clinical Assessment indicating that plaintiff had been diagnosed with "mood disorder secondary to traumatic brain injury" and "PTSD" among other physical ailments. (AR 556-558) Those diagnoses were made following reports by plaintiff of impaired memory and diminished insight under stress, as well as observations of plaintiff demonstrating diminished concentration, attention, and judgment under stress. (AR 556) The assessment also noted that plaintiff had been seeing a psychiatrist for depression since 1999. (AR 557) A treatment plan was set for depression, anxiety, and emotional effects due to brain injury. (AR 559)

Also in late April 2005, plaintiff underwent speech therapy at Saint Joseph Mercy Rehabilitation Services for Speech. The initial evaluation identified plaintiff's diagnosis as

-10-

traumatic brain injury and it provided that plaintiff had difficulty with listening comprehension, mild-moderate dysrythmia, processing speed and memory loss. (AR 654)

On May 17, 2005, Dr. Riess examined plaintiff for revaluation of plaintiff's symptoms of headaches, memory loss, and generalized aches and pains. (AR 242-243) Plaintiff reported that her symptoms were somewhat improved, but she was feeling depressed. Dr. Riess noted that plaintiff's "depression of course is something that has been treated by Dr. Schmidt [sic] for some time. (AR 242) Dr. Riess' findings were unchanged from prior visits and he concluded:

> I feel the patient's symptoms are slightly improved. The patient is
> scheduled to have neuropsychological testing within about the next
> month, and hopefully a treatment plan at the Traumatic Brain
> Injury unit at St. Joe's will be forthcoming. I will make no change
> in her current treatment. She was advised to continue to follow up
> with Dr. Schmitt [sic] for her significant depression. [AR 242]

On June 3, 2005, Dr. Gabrial wrote a progress note that stated diagnoses of dysthymic disorder and DSM-IV 293.83 adjustment disorder with depressed mood. (AR 570) Those progress notes also appear to list traumatic brain injury in the section describing plaintiff's current clinical status. (AR 570) The same two diagnoses were also identified in the progress notes from August 1, 2005. (AR 571)

On June 7, 2005, Dr. Riess examined plaintiff for revaluation of plaintiff's symptoms of headaches, memory loss, and generalized aches and pains. (AR 240) Plaintiff reported that her symptoms were about the same. Plaintiff's examination was generally unchanged and Dr. Riess concluded:

> I feel the patient's symptoms are about the same. Again I am
> awaiting neuropsychological testing. The patient has slightly

-11-

> slurred speech and her swallowing difficulty could be a side effect
> of medication. I would like to wean her from Pamelor. It is
> possible that Xanax could also be causing this, however, the
> patient feels it is very important that she takes this for her anxiety.
> I will order a video fluoroscopic swallowing study to assess her
> perceived swallowing difficulty and have her return to the clinic
> for reevaluation following this test. [AR 240]

On July 5, 2005, Dr. Riess examined plaintiff for revaluation of plaintiff's symptoms of

headaches, memory loss, and generalized aches and pains. (AR 238) Plaintiff reported feeling

much more depressed and that she hardly does anything during the day. The results of Dr. Riess'

examination were:

> Mental status is within normal limits for speech, cognition,
> orientation, and memory. On cranial nerve exam, the pupils are 3
> mm, and equally reactive to light. Funduscopic exam shows sharp
> disks bilaterally. Visual fields are full. Ocular movements are full.
> Facial sensations and musculature are symmetrical. Auditory
> acuity is within normal limits. The tongue protrudes and the uvula
> rises midline. Trapezius power is symmetrical. Swallowing reflex
> is within normal limits. Motor exam shows normal bulk, tone, and
> power. Coordination shows normal rapid repetitive movements.
> Deep tendon reflexes are 2+ throughout. Gait is within normal
> limits for standard gait. Sensory exam shows normal light touch.
> [AR 238]

However, Dr. Riess was concerned about worsening depression:

> I feel the patient's symptoms are somewhat worse. I am very
> concerned by her worsening depression. I have advised her to
> follow up with Dr. Schmitt [sic] until the patient is actually seen by
> the neuropsychiatrist. Her swallowing problems are most likely a
> drug side effect. I would like to discontinue Xanax and increase
> the Klonopin to 0.5 mg, one q.am. And two q.pm. It is
> conceivable that Sinequan, Neurontin, Lexapro, Wellbutrin, or
> Motrin could also be contributing to her swallowing problems. I
> would very much like the help of a psychiatrist in managing these

-12-

medications.  The patient will return to the clinic for reevaluation
in about one month. [AR 238]

On August 2, 2005, Denyce Girard Kerner, Ph.D, licensed psychologist and

neuropsychologist at Saint Joseph Mercy Hospital, issued a Neuropsychological Evaluation after

conducting neuropsychological testing on plaintiff in June and July of 2005.  (AR 329-334)

Plaintiff underwent the evaluation to assess her "neurocognitive and adjustment status secondary

to cognitive problems from depression and a mild traumatic brain injury sustained in an MVA

four months ago."  (AR 333)  According to that evaluation, plaintiff complained of mood

swings, depression, panic attacks, anxiety attacks, and other problems.  (AR 330)  Dr. Kerner

observed plaintiff being both pleasant and depressed at times.  (AR 332)  In Dr. Kerner's

conclusions and recommendations, she listed plaintiff's conditions as DSMIV Axis I diagnosis

as 296.3 Major depression and 294.9 Cognitive Disorder NOS due to Head Trauma and Axis II

diagnosis as 854.00 Traumatic Brain Injury and 435.9 Ischemic Attack, transient.  (AR 334)  Dr.

Kerner also stated that the "severity and nature of the patient's cognitive impairments is

inconsistent with a mild traumatic brain injury and suggests that depression is a primary source

of her functional difficulties."  (AR 333)  Dr. Kerner advised plaintiff to continue going to

therapy because her "primary issue appeared to be depression and a tendency to develop physical

symptoms in response to stress."  (AR 334)

On August 16, 2005, Dr. Riess examined plaintiff for revaluation of plaintiff's symptoms

of headaches, memory loss, and generalized aches and pains.  (AR 236)  As described by Dr.

Riess:

-13-

> Since the last office visit, the patient reports continued depression.
> She has not been able to follow up with Dr. Schmidt [sic] and is
> scheduled to see a new psychiatrist next week.  She denies any
> suicidal ideation.  Her memory loss, generalized aches and pains,
> and headaches are all about the same.  Her neuropsychological
> testing has been completed and it was felt that her symptoms were
> mostly a result of depression with a mild degree of traumatic brain
> injury.  The patient has continued to have some slurred speech.
> The patient's past medical history, social history, family history,
> and review of systems is otherwise unchanged from the previous
> examination of July 5, 2005, as documented in the patient's
> updated medical history form obtained today.  [AR 236]

Dr. Riess' examination revealed: "Mental status is within normal limits for cognition,

orientation, and memory with slightly slurred speech."  Pupils, ocular movement, facial

sensation, auditory acuity, swallowing reflex, motor exam, coordination, reflexes and gait were

all within normal limits.  (AR 236)

Dr. Riess then concluded:

> I feel the patient's symptoms are about the same.  I of course agree
> with the psychologist that most of her problems are due to
> depression.  I feel that some of her slurred speech and balance
> problems may be a side effect of medications.  Rather than change
> the medications myself I would prefer to have her seen by a
> psychiatrist who will do this in a way that will also improve her
> depression.  [AR 236]

On September 14, 2005, Dr. Gabrial performed a psychiatric evaluation on plaintiff.  (AR

572-573)  That evaluation noted that plaintiff had a long history of physical problems and mood

problems, including head trauma in February of 2005.  The evaluation also stated diagnoses of

major depression recurrent, fibromyalgia, and a mood disorder.

-14-

On September 27, 2005, Dr. Riess examined plaintiff for revaluation of plaintiff's symptoms of headaches, memory loss, and generalized aches and pains.  Plaintiff reported that her symptoms were about the same and that she was having daily headaches, generalized aches and pains, and difficulties with her memory.  (AR 234)  The examination revealed that: "Mental status is within normal limits for speech, cognition, orientation, and memory with slightly slurred speech."  (AR 234)  Dr. Riess concluded:

> I feel the patient's symptoms are generally related to depression.  I have encouraged her to continue to follow up with her psychiatrist for further adjustment of her antidepressants as well as follow up with her therapist.  I will increase her Neurontin to 800 mg. q.am and 1600 mg. p.m. to better control her headaches and pain and to stabilize her mood.  [AR 234]

On October 5, 2005, plaintiff applied for Social Security Disability benefits on the basis that she had been unable to work since February 28, 2005, because a brain injury, depression, moods, panic attacks, memory loss, fibromyalgia, tiredness, weakness, trouble with comprehension, bad periperal vision, restless leg syndrom, and irritable bowel syndrome.  (AR 524, 534-536)  That application was initially denied on December 21, 2005.  (AR 520-523)  Plaintiff timely appealed that denial.

On October 28, 2005, Dr. Riess again examined plaintiff for revaluation of plaintiff's symptoms and he again concluded that plaintiff's "symptoms are mostly related to depression."  (AR 233)  Similarly, Dr. Riess examined plaintiff on November 16, 2005, before concluding that plaintiff's symptoms were "mostly related to depression."  (AR 232)

-15-

Plaintiff also applied for long term disability benefits with the Plan.  On November 5, 2005, defendant approved plaintiff's claim for long term disability benefits.  The effective date for the benefits was identified as August 28, 2005, and benefits were approved through April 30, 2006, pending review of additional medical documentation.  (AR 547-550)

On December 27, 2005, Dr. Riess examined plaintiff for re-evaluation of plaintiff's symptoms of headaches, memory loss, and generalized aches and pains.  (AR 228)  Plaintiff reported that his symptoms were about the same.  Dr. Riess noted an abnormal MRI scan while concluding "I feel the patient's abnormal MRI scan could be due to her head injury although there have been changes in subsequent exams.  Multiple sclerosis is still possible however the oligoclonal banding was negative (this is only 80 percent sensitive for MS)."  (AR 228)

On January 10, 2006, Dr. Riess examined plaintiff for re-evaluation of plaintiff's symptoms of headaches, memory loss, and generalized aches and pains.  (AR 226)  Plaintiff reported. her symptoms are somewhat improved: "She is taking Topamax 50 mg b.i.d. and feels that her head pain and generalized aches and pains are somewhat improved."  Dr. Riess continued to be concerned about the abnormal MRI scan, and he stated that it might be due to her previous head injury, an active process of multiple sclerosis, or small strokes.

On February 21, 2006, Dr. Riess examined plaintiff for re-evaluation of plaintiff's symptoms of headaches, memory loss, and generalized aches and pains.  (AR 223)  Plaintiff reported her headaches were unchanged and she complained of increased memory loss due to taking a high dosage of Topamax.  Plaintiff also felt her depression had worsened.  Dr. Riess' examination revealed that everything was normal, with the exception of plaintiff's slight speech

slurring.  Dr. Riess then concluded that plaintiff's headaches were poorly controlled and that Topamax was producing unacceptable side effects of memory loss without controlling the headaches.  Dr. Riess changed plaintiff's medications and he hoped that the new medication would both improve plaintiff's depression and control plaintiff's headaches.

On March 21, 2006, Dr. Riess examined plaintiff for re-evaluation of plaintiff's symptoms of headaches, memory loss, and generalized aches and pains.  (AR 221)  Plaintiff reported that her symptoms were improving and the examination was normal, with only minimal speech slurring.  Dr. Riess also noted that plaintiff's headaches were under somewhat better control.

By April of 2006, plaintiff had stopped receiving treatment at Saint Joseph Mercy Behavioral Services and, on April 12, 2006, plaintiff underwent a psychiatric evaluation at HelpSource Counseling Services.  (AR 510-512)  Plaintiff's physician at HelpSource was Dr. Leon J. Quinn, psychiatrist.  (AR 512)  That evaluation identified plaintiff as suffering from major depression.  (AR 512)  Similarly, Dr. Quinn's treatment notes from May 17, 2006, August 16, 2006, September 6, 2006, and July 12, 2006  all indicate a diagnosis of major depression. (AR 486-488, 509)

On April 21, 2006, Dr. Riess examined plaintiff for re-evaluation of plaintiff's symptoms of headaches, memory loss, and generalized aches and pains.  (AR 220)  Plaintiff reported that her symptoms were unchanged, except that her headaches were under reasonable control.  The results of the examination were normal, with only minimal speech slurring.  Dr. Riess concluded

-17-

that plaintiff's headaches were under reasonable control and that "[t]he remainder of her problems have a prominent psychiatric component."  (AR 220)

On June 2, 2006, Dr. Riess examined plaintiff for re-evaluation of plaintiff's symptoms. (AR 219)  Plaintiff reported that her symptoms were unchanged and Dr. Riess concluded that the headaches were under good control and that the "remainder of her problems are mostly psychiatric in nature."  Plaintiff was advised to follow-up with her psychiatrist.

On July 17, 2006, Dr. Riess examined plaintiff for re-evaluation of plaintiff's symptoms of headaches, memory loss, and generalized aches and pains.  (AR 217)  Plaintiff reported that her symptoms were unchanged, but Dr. Riess noted that Dr. Quinn had increased plaintiff's medications and that it had helped with her depression.  Dr. Riess also noted that plaintiff had an episode of feeling agitated one day and Dr. Riess attributed this to "an interaction with alcohol with her multiple psychotropic medications."

On September 21, 2006, Dr. Quinn, responding to a request from defendant, filled out a report indicating that plaintiff suffered from major depression recurrent, traumatic brain injury secondary to an auto accident, fibromyalgia, hypothyroidism, and other physical ailments.  (AR 484-485)

On September 21, 2006, Renee Mingus, M.A., L.L.P. at HelpSource Counseling Services, responded to defendant's request for information and stated that plaintiff had been diagnosed with major depressive disorder recurrent severe, traumatic brain injury, GERD, fibromyalgia and hypothyroidism.  Ms. Mingus listed plaintiff's symptoms as depressed mood, sleep disturbance, lethargic, tires easily, word finding difficulty, impaired concentration, and

memory.  She also noted that plaintiff has "marked lack of energy and has difficulty completing tasks w/in (sic) an expected time frame."  Ms. Mingus further noted that no diagnostic tests were performed.  Ultimately, Ms. Mingus concluded that, given plaintiff's physical problems, memory impairments and impaired concentration, "it does not appear that [plaintiff] is able to return to work at this time."  (AR 495)

On October 16, 2006, Dr. Riess examined plaintiff for re-evaluation of plaintiff's symptoms.  (AR 215)  Plaintiff reported that her headaches had worsened, but Dr. Riess decided to wait for Dr. Quinn to increase plaintiff's medications as that increase could control the headaches.

On October 30, 2006, Dr. Riess examined plaintiff for re-evaluation of plaintiff's symptoms.  (AR 213)  Plaintiff reported that her symptoms were about the same and Dr. Riess' examination revealed no changes except for an abnormal MRI of the cervical spine, with no evidence of myelopathy.  Plaintiff's mental examination was within normal limits and there was no mention of slurred speech.

On December 11, 2006, Dr. Riess examined plaintiff for re-evaluation of plaintiff's symptoms.  (AR 212)  Plaintiff reported that she was doing the same while Dr. Riess concluded that patient's symptoms were slightly improved.  Dr. Riess also suggested that plaintiff start physical therapy.

In January 2007, plaintiff was approved for Social Security Disability benefits.  (AR 470-474)  The Social Security Administration found her disabled as of February 28, 2005.  (AR 470)  In an opinion, the Administrative Law Judge (ALJ) found that, after the motor vehicle

-19-

accident, plaintiff began "started developing mental problems, including difficulties with concentration and understanding, getting lost in her own house, and an exacerbation of her depression." (AR 293)  The ALJ also found that the "medical evidence establishes that the claimant has the following 'severe' impairments: major depression, a cognitive disorder status-post traumatic brain injury, and fibromyalgia." (AR 294)  The ALJ further found that, given her impairments, plaintiff could not perform the requirements of her past relevant work, and that her residual functional capacity for the full range of sedentary work was reduced by significant limitations.  (AR 294)  As stated by the ALJ, plaintiff was disabled because "[c]onsidering the claimant's considerable limitations, she cannot make the adjustment to any work that exists in significant numbers in the national economy."  (AR 295)

On January 22, 2007, and February 19, 2007, Dr. Riess examined plaintiff for re-evaluation of plaintiff's symptoms of headaches, memory loss, and generalized aches and pains. (AR 209-210)  Plaintiff reported and Dr. Riess' examination revealed that plaintiff's symptoms were unchanged.

On April 18, 2007, Dr. Riess examined plaintiff for re-evaluation of plaintiff's symptoms of headaches, memory loss, and generalized aches and pains.  (AR 208)  Plaintiff reported that she felt about the same and Dr. Riess concluded that plaintiff's symptoms were the same.  Dr. Riess also concluded that "I feel the patient is significantly disabled by her current symptoms and that her symptoms are a direct result of the motor vehicle accident she sustained."

On May 16, 2007,  Dr. Quinn again responded to defendant's request for him to answer a psychiatric questionnaire.  In his answers, Dr. Quinn noted the diagnoses of major depressive

disorder, traumatic brain injury secondary to auto accident, fibromyalgia, hypothyrodism and TIA, restless leg syndrome, and GERD.  Dr. Quinn also noted that plaintiff reports having memory problems, mobility limitations, persistent pain, low energy, lethargy, and problems with focus and concentration, and that those problems impair her from performing work-related activities.  (AR 459-460)

On June 14, 2007, defendant wrote to plaintiff and advised her of the twenty-four month limitation under the Plan for disabilities due to mental or nervous disorders or disease.  The letter also advised plaintiff that the limitation would not apply to a disability resulting from schizophrenia, dementia, or organic brain disease.  According to the letter, defendant's records showed that plaintiff's disability was due to major depression and, consequently, her disability benefits would end on August 27, 2007.  Defendant further advised plaintiff to submit documentation if she was claiming disability for something other than a mental/nervous disorder. (AR 454-455)

On July 18, 2007, plaintiff underwent an EMG.  In a subsequent letter to Dr. McLearon, Dr. Riess wrote that the results of the EMG indicated a right sided cervical radiculopathy at both C6 and C8 and a mild right sided carpal tunnel syndrome.  (AR 436)

On August 3, 2007, defendant sent plaintiff a letter describing the termination of her long term benefits.  (AR 450-451)  In that letter, defendant advised plaintiff that it had completed its review of her claim and, based on information submitted by Dr. Quinn, it had determined that her disability was the result of recurrent major depressive disorder and, thus, benefits are limited

to twenty-four months.[3]  Defendant also advised plaintiff that the long term disability would end on August 27, 2007.

On August 13, 2007, Dr. Riess responded to defendant's request for an Attending Physician Statement.  (AR 447-449)  That statement provided that Dr. Riess' primary diagnosis was post-concussion syndrome and secondary diagnosis was headaches.  Dr. Riess also wrote that plaintiff's symptoms included headaches, aches and pains, memory loss and decreased mood.  Dr. Riess also stated that stress factors and problems such as marked depression, post-concussion syndrome, memory loss and neuropsychological symptoms affect plaintiff's ability to perform her job and that it is his opinion that her frequent headaches and head injury are the reason she is unable to perform her job duties.

On September 12, 2007, Dr. Riess examined plaintiff for reevaluation of plaintiff's symptoms.  (AR 206)  Plaintiff reported that her symptoms were the same while Dr. Riess concluded that plaintiff's symptoms were about the same while noting that it was likely that her headaches were improving to some extent spontaneously.

On September 28, 2007, defendant referred the claim to Carol Walker, Ph.D., for record review.  (AR 404-408)  Walker did not examine plaintiff or speak with any of the treating medical personnel.  Walker did not speak with Dr. McLearon's office because Dr. McLearon requested a release form and such a form was not provided in the records for review.  Walker did

_____

[3]Defendant also advised plaintiff that it had received information from Dr. Riess, but that the information was dated January 22, 2007, and it did not provide any information on plaintiff's current condition or any elaboration on whether the conditions treated by Dr. Riess would preclude plaintiff from work.

not speak to Dr. Riess because Dr. Riess' office advised her that he would only respond to

written questions.  It does not appear that Walker attempted to contact any other treating

physician.  (AR 406)  In her report, Walker stated:

> In my opinion, the primary diagnosis is Major Depressive Disorder
> Recurrent, Severe.  This is the most recent diagnosis provided by
> her treating psychiatrist, Dr. Quinn.  When she was initially seen
> by Dr. Riess in 2005, he opined her problems were related
> primarily to depression.
>
> ***
>
> There is no objective evidence to support restrictions and
> limitations from a psychological/neuropsychological perspective.
> There are subjective complaints of cognitive deficits that
> reportedly arose from a motor vehicle accident in which Ms. Laird
> describes sustaining a whiplash injury.  There is no notation in the
> records of head trauma in the accident, although she was later
> noted to have sustained a brain injury.  The data on which this
> diagnosis was made is not included.  There is also documentation
> of a neuropsychological evaluation in the past but the results are
> not described.
>
> ***
>
> Individuals with depression and post concussive syndrome often
> see themselves as more cognitively impaired than is objectively the
> case.  Ms. Laird also has a history of other physical disorders for
> which the diagnoses are primarily based on self report.  This may
> represent a tendency to express psychological distress by
> developing physical symptoms.  Her current symptoms appear to
> have developed after she changed positions at work.  She
> reportedly moved into a more stressful management type position.
> The degree to which this has affected her condition must be
> considered.  While she reports deficits in memory and attentional
> mechanisms, there is no documentation of observed deficits in this
> regard.  [AR 406-407]

-23-

On January 7, 2008, plaintiff, through counsel, requested review of the decision to terminate benefits on the basis of the twenty-four month limitation.  (AR 402-403)  According to that letter, plaintiff wished to appeal the decision because "her injury falls within the exclusion of the limitation on mental or nervous disorders/diseases."

On March 12, 2008, defendant requested a Peer Review Report from Dr. Leonid L. Topper.  (AR 377)  In that report, Dr. Topper summarized the results of the records he reviewed:

> The claimant was involved in MVA on 2/28/05. The CT of the cervical spine on February 28, 2005, revealed degenerative disc disease at C4 through C7. The MRI of the brain on April 02, 2005 demonstrated scattered tiny foci of altered signal in cerebral white matter, representing a slight increase from the previous imaging on February 04, 2004. The EEG on April 05, was normal. The videofluoroscopic swallow study (VFSS) performed on June 10, 2005 was normal.

> The claimant was seen by a therapist at Saint Joseph Mercy Health System from September 08, 2005 through January 19, 2006.  The claimant was seen by the neurologist, Gerald Riess, MD, on September 27, 2005 for evaluation of headaches, memory loss and generalized aches and pains following a motor vehicle accident. Dr. Riess reported that "I feel the patient's symptoms are primarily related to depression."  Neurontin was increased.  Dr. Riess advised the claimant to follow up with her psychiatrist.

> ***

> The MRI of the brain on November 20, 2005, showed scattered small foci of altered signal in cerebral white matter, including several new compared to the imaging on April 02, 2005.  On January 22, 2007, in a follow up visit with Dr. Riess, the claimant reported that physical therapy did not improve her symptoms and she found it painful to perform stretching.  The claimant's medications were Topanax, Sinequan and Esgic-Plus.  The mental status examination and neurological examination were normal. Vicodin was prescribed.  Dr. Riess felt that the claimant would

benefit from reconditioning therapy, however the claimant found it
to be quite painful.

Dr. Riess' note dated April 18, 2007, reports that the claimant's
symptoms remained the same.  According to the note, "her mood
seems to be under somewhat better control."  The mental status
examination was normal.  The claimant's speech was somewhat
slurred.  Dr. Riess advised her to increase her exercise.  Dr. Riess
notes "I feel the patient is significantly disabled by her current
symptoms and that her symptoms are a direct result of the motor
vehicle accident she sustained." . . .

An attending physician statement was completed by Dr. Riess on
August 13, 2007, listing the claimant's symptoms as headaches,
aches and pain, memory loss, and decreased mood.  Dr. Riess felt
that frequent headaches and a head injury restricted the claimant
from performing her job duties.  [AR 378]

Dr. Topper did not speak with Dr. McLearon, Dr. Riess, Dr. Quinn, or Ms. Mingus.  According

to Dr. Topper, Dr. Riess was not willing to discuss plaintiff's case over the phone, though he

stated he would have answered questions in writing, and the phone number for Dr. Quinn and

Ms. Mingus indicated that their practice was closed.  (AR 377)

In responding to specific questions of defendant, Dr. Topper stated:

The claimant's mental status examination was documented to be
normal on several occasions by Dr. Gerald Riess.  The claimant
had normal cognition, orientation and memory.  Therefore, the
claimant's complaints of memory loss are subjective and not
confirmed by neurological examination.  The MRI findings of foci
of white matter change are not of sufficient severity to cause
decline in the claimant's cognitive status.  The MRI findings do
not demonstrate any evidence of traumatic brain injury.

4. Please call HCP.  Does the claimant's diagnosis fall under the
exclusionary diagnosis of organic brain syndrome?

-25-

> Based on the medical records, the claimant does not have evidence
> of organic brain disease.  I was unable to establish contact with
> either Dr. Riess or Dr. Quinn.
>
> The claimant's mental status was normal on bedside examination.
> Her entire neurological examination was demonstrated to be
> normal on several occasions.  The claimant did not require any
> memory rehabilitation and did not complain of any difficulties in
> everyday living situations regarding her memory.  The diagnosis of
> traumatic brain injury stated by the psychiatrist is claimant
> reported and is not based on any persuasive clinical or radiological
> evidence.  [AR 379]

Psychiatrist Lee Becker also issued a Physician Consultant Review at the request of

defendant.  (AR 382-385)  Dr. Becker did not speak with any of the treating physicians, but he

did note that a call to the number for Dr. Quinn and Ms. Mingus revealed that their mental health

center was no longer providing services and that no forwarding number was provided.  (AR 385)

Dr. Becker did describe the records and information he reviewed, which included a May 16,

2007 questionnaire from Dr. Quinn, a August 13, 2007 statement from Dr. Riess, diary notes

from defendant's Case Management Team, a personal profile filled out by plaintiff, letters from

Dr. Riess, progress notes from Saint Joseph Mercy Center Mental Health Clinicians, progress

notes from Helpsource Mental Health Clinicians, other clinician questionnaires from Dr. Quinn,

a September 21, 2006 clinician questionnaire from Ms. Mingus, and the physician file review of

Walker.  (AR 384)  In responding to the question of whether plaintiff's "mental illness fit within

the exclusionary diagnoses of schizophrenia, dementia or organic brain syndrome," Dr. Becker

responded that plaintiff's "mental illness does not fall under any of the above exclusionary

diagnoses. The primary diagnosis for treatment of the mental health condition appeared to be

primarily major depressive disorder." [AR 384]

On March 28, 2008, plaintiff submitted additional records to defendant, including an

Affidavit of Dr. Riess, records from Ann Arbor Neurology Associates, Saint Joseph Hospital,

Sparrow Behavioral Health Service, Saint Joseph Mercy Hospital, HelpSource and from the

Social Security Administration. (AR 195-374) The affidavit of Dr. Riess provided:

> 4.      Deborah Laird has been a patient of mine since 1994.

> 5.      I have treated Deborah Laird, for injuries she sustained as a result of a motor vehicle collision which occurred on February 28, 2005.

> 6.      I believe to a reasonable degree of medical certainty, based upon my own examinations and the results of her neuro-psychological testing, which I have personally reviewed, that as a result of the motor vehicle collision, Deborah Laird has suffered a serious neurological injury.

> 7.      I saw Ms. Laird on March 23, 2005, one month after the accident and at that time she reported slurred speech and headaches pretty much on a daily basis; she had difficulty concentrating and her memory was poor; when seeing her in April 19, 2005, she reported she was anxious and panicky. These were all new symptoms that she did not present with at the time of her previous visit on January 24, 2005.

> 8.      At that time, based on my examination and the history I obtained from her and based on my past treatment of Ms. Laird, to a reasonable degree of medical certainty, I diagnosed her with post concussional syndrome, as a direct result of the motor vehicle accident of February 28, 2005.

> 9.      I referred her for an MRI which showed scattered small foci of altered signal intensity in the cerebral white matter,

which was slightly more prominent than her previous study
of February 4, 2004, caused by the motor vehicle accident
of February 28, 2005.

10.     In my opinion, to a reasonable degree of medical certainty,
        Ms. Laird is suffering from a traumatic brain injury, as a
        direct and proximate result of the motor vehicle accident of
        February 28, 2005.

11.     A traumatic brain injury is an organic brain disease and this
        is the condition for which I have been treating her since
        March 23, 2005, and the condition for which I have
        disabled her from all physical and cognitive employment.

12.     Upon my last visit with Ms. Laird on December 14, 2007, I
        found her symptoms to be slightly improved with
        medication, but she has not yet reached her pre-accident
        status.

13.     It is my opinion that Ms. Laird remains completely
        disabled from her previous occupation of a machinist for
        TRW. She continues to be unable to perform any physical
        or cognitive occupation. [AR 196-197]

Plaintiff also submitted records from a treating psychiatrist, Dr. Shumin Zhao at Sparrow

Behaviorial Health Services.  (AR 161-166)  Plaintiff began treatment with Dr. Zhao on October

3, 2007.  Upon initial evaluation, Dr. Zhao diagnosed plaintiff with DSM IV diagnosis, Axis I

Dysthymic Disorder 300.4, Chronic Panic Disorder, mild cognitive deficits secondary to

traumatic brain injury, headaches, fibromyalgia, and traumatic brain injury.  (AR 164-166)

Subsequent progress notes by Dr. Zhao listed the same diagnoses.  (AR 161-163)

Defendant submitted the additional information provided by plaintiff to Dr. Topper and

Dr. Becker and both of those doctors provided addendums to their earlier reports.  Dr. Becker's

Addendum noted that Dr. Riess' letters showed that plaintiff had received psychiatric treatment

-28-

for depression prior to 2000, and that prior to the automobile accident, plaintiff had diagnosis of restless leg syndrome, mixed headaches, and fibromyalgia.  (AR 191)  Dr. Becker also noted that the progress notes from Saint Joseph Mercy Behavioral Health Services initially showed treatment for a mood disorder secondary to brain injury and, after a neuropsychological evaluation, treatment for major depression, recurrent.  (AR 191)  Dr. Becker further noted that the August 2, 2005 Neuropsychology Evaluation from Dr. Kerner described the severity and nature of plaintiff's cognitive impairments, the diagnostic impression stated in the Evaluation was major depression with a secondary diagnosis of cognitive disorder due to head trauma, and the Evaluation noted that "marked slowing and labored speech is not typical of a mild traumatic brain injury."  According to Dr. Becker, the findings of the Evaluation are consistent with a mild traumatic brain injury and support the primary diagnosis of depression.  (AR 191-192)  Dr. Becker also noted that both the records from the HelpSource and Dr. Zhao indicated that the focus of treatment was for major depressive disorder, recurrent, or dysthmyic disorder.  (AR 192-193)  In response to the question whether "the additional documentation support that the Claimant has been diagnosed with any of the exclusionary psychiatric diagnosis, note to be schizophrenia, dementia or organic brain syndrome," Dr. Becker answered: "From a psychiatric perspective, the additional information does not change the prior, above psychiatric IPC Report findings.  The information reviewed showed that the primary focus of psychiatric treatment was either for major depression disorder or dysthmyic disorder."  (AR 193)

-29-

Dr. Topper's second report provides that he reviewed the additional records and, in response to the question of whether the additional documentation changed his previous opinion, Dr. Topper stated:

> The additional documentation does not change my previous opinion.  This claimant had abnormalities revealed at her neuropsychological testing in 8/2005, which chiefly related to her depression. The effect of the trauma on her cognitive performance was expected to improve, and was not deemed as permanent by a neuropsychologist. Since 2005, the claimant's mental status and neurological exam were described as normal by Dr. Riess on multiple occasions. The claimant's spine imaging is stable. The legal decisions considering the claimant unable to work relate to the compound effects of her conditions including long-standing fibromyalgia and depression. However, from a neurological point of view, there is no evidence of inability to work due/functional limitations. As such my prior opinion does not change. [AR 175]

On May 28, 2008, defendant sent plaintiff a letter upholding the original determination to terminate benefits.  (AR 156-160)  That letter concluded:

> Based on the medical information reviewed, including the additional medical information that was submitted on behalf of Ms. Laird's appeal, the primary diagnosis for treatment of the mental health condition appeared to be primarily major depressive disorder.  In addition, the medical [sic] indicated Ms. Laird's mental status examination was normal on several occasions and she had normal cognition, orientation and memory.  The MRI findings of foci of white matter change were not of sufficient severity to cause decline of cognitive status to Ms. Laird and they did not demonstrate any evidence of traumatic brain injury.  The medical [sic] did not indicate that there was any evidence provided indicating Ms. Laird's ability to work had been impacted by adverse effects of medication during the time period in question nor was there any documentation that Ms. Laird had any side effects due to the medications she was prescribed.

> Review of this information that was submitted in appeal along with the information on record shows that Ms. Laird received 24 months of Long Term Disability, which is the maximum period payable under the Plan.  Therefore, the original claim determination was appropriate and Ms. Laird's claim will remain terminated beyond August 27, 2007.  [AR 160]

## III. Legal Standards

### A. ERISA

Congress enacted ERISA to "'protect . . . the interests of participants in employee benefit plans and their beneficiaries' by setting out substantive regulatory requirements for employee benefit plans and to 'provid[e] for appropriate remedies, sanctions, and ready access to the Federal courts.'"  Aetna Health, Inc. v. Davila, 542 U.S. 200, 208 (2004), quoting 29 U.S.C. §1001(b) (2000).

A claim involving an Employee Benefit Plan may be brought under the civil enforcement provisions of ERISA and is regarded as arising under federal law.  The courts have been directed to develop substantive federal common law as necessary to interpret ERISA and fashion remedies to effectuate the policies underlying ERISA.  29 U.S.C. § 1132(a); Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 109-110 (1989).  ERISA generally preempts all state laws that relate to Employee Benefit Plans.  29 U.S.C. § 1144(a).

With one exception, federal district courts have exclusive jurisdiction over civil actions brought under ERISA, including claims alleging breach of fiduciary duty, claims requesting equitable relief, other than benefit claims and claims involving statutory penalties under ERISA. 29 U.S.C. § 1132(e)(1).  The exception applies to civil actions brought under 29 U.S.C. §

1132(a)(1)(B) to recover benefits under the terms of the Plan, enforce rights under the terms of

the Plan, or clarify the participant's rights to future benefits under the Plan.  When the exception

applies, federal and state courts have concurrent jurisdiction.  29 U.S.C. § 1132(e)(1).  The

amount in controversy or the citizenship of the parties is irrelevant.  29 U.S.C. § 1132(f).

### B. Disability Evaluation

While ERISA governs the Employee Benefit Plan in general, whether a claimant is

entitled to disability benefits is determined by the language set forth in the individual Plan.

Plaintiff claims that she is entitled to an exemption for the twenty-four month limitation on long-

term disability benefits because she has "organic brain syndrome."  As described above, under

the terms of the Plan at issue in this case:

> **Disabled** or **Disability** means that, due to Sickness or as a direct result of accidental
> injury:
>
> •       You are receiving Appropriate Care and Treatment and complying with the
>         requirements of such treatment, and
>
> •       You are unable to earn:
>
>> •       during the Elimination Period and the next 6 months of Sickness or
>>         accidental injury, more than 80% of Your Predisability Earnings at Your
>>         Own Occupation from any employer in Your Local Economy; and
>>
>> •       after such period, more than 60% of your Predisability Earnings from any
>>         employer in Your Local Economy at any gainful occupation for which
>>         You are reasonably qualified taking into account Your training, education
>>         and experience. [AR 25 (emphasis in original)

Additionally, the Plan limited long term disability benefits for disabilities due to mental or

nervous disorders or diseases:

**For Disability Due to Mental or Nervous Disorders or Diseases**

If you are Disabled due to a Mental or Nervous Disorder or Disease, We will limit Your Disability benefits to a lifetime maximum equal to the lesser of:

• 24 months, or
• the Maximum Benefit Period.

This limitation will not apply to a Disability resulting from:

• schizophrenia;

• dementia; or

• organic brain syndrome.

**Mental or Nervous Disorder or Disease** means a medical condition which meets the diagnostic criteria set forth in the most recent edition of the Diagnostic and Statistical Manual Of Mental Disorders as of the date of Your Disability. A condition may be classified as a Mental or Nervous Disorder regardless of its cause. [AR 46 (emphasis in original)]

## C. Standard of Review

The United States Supreme Court held in <u>Firestone Tire & Rubber Co. v. Bruch</u> that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  489 U.S. at 115.  Where the benefit plan grants the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the Plan, the highly deferential arbitrary and capricious standard of review is appropriate.  <u>Yeager v. Reliance Standard Life Ins. Co.</u>, 88 F.3d 376, 381 (6th Cir. 1996).  While there are no "magic words" required to vest discretion, this circuit has consistently required that the Plan's grant of discretionary authority be express and clear.  <u>See</u>,

-33-

*e.g.*, Yeager, 88 F.3d at 381; Wulf v. Quantum Chemical Corp., 26 F.3d 1368, 1373 (6th Cir.

1994).

Here, the Plan provides:

**Discretionary Authority of Plan Administrator
and Other Plan Fiduciaries**

> In carrying out their respective responsibilities under the Plan, the Plan administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan. Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.

Reading that contractual language in an ordinary and common sense way, as this court must, the

only reasonable interpretation of the Plan is that it grants discretionary authority to defendant to

determine eligibility for benefits and to construe the terms of the Plan.  Because the Plan grants

discretionary authority to defendant to determine eligibility for benefits, the arbitrary and

capricious standard of review applies.

The arbitrary and capricious standard of review is "the least demanding form of judicial

review of administrative action," Williams v. International Paper Co., 227 F.3d 706, 712 (6th

Cir. 2000), and is applied in order to avoid "excessive judicial interference with plan

administration."  Daniel v. Eaton Corp., 839 F.2d 263, 267 (6th Cir. 1988) (citations omitted).

The decision of a Plan administrator will not be considered arbitrary and capricious if it is

"rational in light of the plan's provisions."  Daniel, 839 F.2d at 267.  Stated differently, "when it

is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." Williams, 227 F.3d at 712.

In this case, plaintiff does not dispute that the arbitrary and capricious standard applies, but she does argue that the standard is affected by two factors in this case. Plaintiff first argues that the court should be less deferential because defendant, as both the insurer and plan administrator, operated under a conflict of interest. In Peruzzi v. Summa Med. Plan, 137 F.3d 431 (6th Cir. 1998), this circuit held that the "conflict of interest inherent in self-funded plans does not alter the standard of review, but 'should be taken into account as a factor in determining whether the ... decision was arbitrary and capricious.'" 137 F.3d at 433, (quoting Davis v. Kentucky Fin. Cos. Retirement Plan, 887 F.2d 689, 694 (6th Cir. 1989)) (alteration in original). It is now settled that "'there is an actual, readily apparent conflict ..., not a mere potential for one,' when the company or plan administrator is the insurer that ultimately pays the benefits." Gismondi v. United Techs. Corp., 408 F.3d 295, 299 (6th Cir. 2005) (alteration in original) (quoting Killian v. Healthsource Provident Adm'rs, 152 F.3d 514, 521 (6th Cir. 1998)). "But if the conflict of interest did not actually motivate defendant's decision, then it is given no weight as a factor in determining whether the decision was arbitrary and capricious." Pflaum v. UNUM Provident Corp., 175 Fed. Appx. 7, 10 (6th Cir. 2006). See also Hockin v. Kmart Corp. Long Term Disability Income Plan, 105 Fed. Appx. 755, 757 (6th Cir.2004) ("[W]here a 'review of the record reveals no significant evidence that [the administrator] based its determination on the costs associated with [the claimant's] treatment or otherwise acted in bad faith, we cannot conclude that [the administrator] was motivated by self-interest.'").

After reviewing the evidence, this Court concludes that plaintiff failed to demonstrate that the conflict of interest motivated defendant to terminate plaintiff's long term disability benefits.  Beyond identifying the conflict of interest and stating why she disagrees with defendant's decision, plaintiff does not address this issue at all.  Plaintiff offers no evidence that the conflict of interest affected defendant's decision and, instead, she relies on the potential conflict of interest inherent in defendant's dual role of insurer and claims administrator.  Plaintiff must put forward some evidence that the conflict of interest affected the claim denial if that conflict of interest is going to be a factor in the court's analysis.  See Cooper v. Life Insurance Co., 486 F.3d 157, 165 (6th Cir. 2007) (rejecting a plaintiff's conflict of interest argument where "[the plaintiff] provided no evidence whatsoever that [the administrator's] denial of benefits was motivated by its alleged conflict of interest.").  In light of the fact that plaintiff points to nothing beyond the mere existence of a conflict of interest to show that defendant's decision was motivated by self-interest, this court cannot give further consideration in the arbitrary and capricious analysis to the possibility that the conflict affected defendant's decision-making.

Plaintiff also argues that the arbitrary and capricious standard of review should be less deferential in this case because limitations and exclusions in a Plan are construed against the Insurer under the rule of *contra proferentem*.  However, this Court finds that *contra proferentem* does not apply to interpretation of ERISA plans reviewed under an arbitrary and capricious standard.  In Moos v. Square D Co., 72 F.3d 39, 42 (6th Cir. 1995), the Sixth Circuit held that the arbitrary and capricious standard applied and that, as a result, the court would give the plan administrator discretion in interpreting any ambiguous terms in the plan: "we grant plan

-36-

administrators who are vested with discretion in determining eligibility for benefits great leeway in interpreting ambiguous terms."  Subsequent cases similarly have rejected the use of *contra proferentem* when reviewing benefit determinations under an arbitrary and capricious review. See also Smiljanich v. Gen. Motors Corp., 182 Fed Appx. 480, 486 n. 2 (6th Cir. 2006) (rejecting the use of *contra proferentem* in an arbitrary and capricious review and holding that the administrator had the discretion to resolve a conflict between two provisions in the ERISA plan); Peach v. Ultramar Diamond Shamrock, 229 F.Supp.2d 759, 766 (E.D. Mich.2002) ("This Court likewise concludes that *contra proferentem* is not a rule of construction that is applicable to ERISA plans which are reviewed under an arbitrary and capricious standard, as in this case.") (Lawson, J.).  Other courts of appeals have reached the same conclusion as well.  See, *e.g.*, Kimber v. Thiokol Corp., 196 F.3d 1092, 1100 (10th Cir. 1999) (holding that *contra proferentem* does not apply when the standard of review is arbitrary and capricious); Morton v. Smith, 91 F.3d 867, 871 n. 1 (7th Cir. 1996) (same); Pagan v. NYNEX Pension Plan, 52 F.3d 438, 443-44 (2d Cir. 1995) (same); Winters v. Costco Wholesale Corp., 49 F.3d 550, 554 (9th Cir. 1995) (same).

In University Hospitals of Cleveland v. Emerson Electric Co., 202 F.3d 839, 846-47 (6th Cir. 2000), the Sixth Circuit did note that it would apply the rule of *contra proferentem* to the case, which involved the arbitrary and capricious standard.  However, subsequent unpublished Sixth Circuit cases have called this contention of University Hospitals into question.  In Smiljanich, 182 Fed. Appx. at 486 n. 2, the Sixth Circuit relied on Moos in granting the plan administrator discretion to resolve a conflict between two provisions in an ERISA plan and

declined to follow University Hospitals.  The Smiljanich panel found that granting the

administrator discretion to construe ambiguous terms was more consistent with the Supreme

Court's decision in Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989), which explained

the appropriate standard of review in ERISA benefits cases.

 Similarly, in Mitchell v. Dialysis Clinic, Inc., 18 Fed. Appx. 349, 353-354 (6th Cir.

2001), the Sixth Circuit rejected University Hospitals' use of *contra proferentem* on the basis

that the panel in that case incorrectly applied Perez v. Aetna Life Ins. Co., 150 F.3d 550 (6th

Cir.1998).  As found in Mitchell:

> As the parenthetical notes, the court in *University Hospitals*
> attributes the application of the rule of interpretation [*contra
> proferentum*] to the *Perez* court.  When we examine Perez, we see
> that the court was not talking about applying the principal to
> "temper" the arbitrary and capricious standard.  Rather, the Perez
> court was interpreting the provision that was alleged to grant that
> discretion--the principal issue in the case.  See Perez v. Aetna Life
> Ins. Co., 150 F.3d 550, 557 n. 7 (6th Cir. 1998) (en banc).  It was
> in that context that the court said it was possible to apply the state
> rule of interpretation.  *See id.*  ("Because the only reasonable
> interpretation of the Plan concludes that *it vests discretion* in Aetna
> to make benefit determinations, Perez's *contra proferentum*
> argument lacks merit.") [Mitchell, 18 Fed. Appx. at 353 (emphasis
> in original).]

 Here, there is no doubt that the Plan vests discretion in defendant to make benefit

determinations and, therefore, this Court will not use the rule of *contra proferentem* in

interpreting any ambiguous terms in the Plan.

## IV. Analysis

 The parties do not dispute that plaintiff is disabled, that the terms of the Plan generally

limit long term disability benefits for disabilities from "mental or nervous disorder or disease" to

twenty-four months, and that the benefits for a disability due to organic brain syndrome are not subject to the twenty-four month limitation governing disabilities due to mental or nervous disorder or disease.  The only issue before the court, therefore, is whether defendant was arbitrary and capricious in its determination that plaintiff's disability stems from a mental disorder or disease other than organic brain syndrome.[4]

As a preliminary matter, this court would note that the exact meaning of "organic brain syndrome" is unclear from the record.  The Plan does not define organic brain syndrome anywhere in its provisions and, while various medical professionals provided opinions on whether plaintiff's disability was due to organic brain syndrome, none of those medical professionals explained what that condition is.  Moreover, the Sixth Circuit has specifically found, in an unpublished opinion, that "organic brain syndrome" is a medically imprecise term. See Hildebrand v. Fortis Benefits Ins Co., 70 Fed. Appx. 798, 801 (6th Cir. 2003).

While there is nothing in the administrative record, the parties did attempt to define organic brain syndrome in their briefs.  Defendant cites to an online encyclopedia that provides that "organic brain syndrome" is a general term referring to physical disorders that cause decreased mental function and that it generally causes varying degrees of confusion, delirium, agitation and dementia, and that it is diagnosed by CT scans, MRI, EEG, and blood tests to evaluate for medical conditions.  (University of Pennsylvania Health System, Health Encyclopedia; attached as Exhibit O to Defendant's Motion to Affirm Administrator's Decision). Plaintiff, on the other had, cites to a medical dictionary that defines "organic brain syndrome" as

---

[4]The Plan also excludes disabilities due to schizophrenia or dementia from the twenty-four month limitation, but neither of those exceptions apply here.

a "large group of acute and chronic mental disorders associated with brain damage or impaired cerebral function" whose clinical characteristics vary while possibly impairing consciousness, orientation, memory, intellect, judgment and insight, and thought content, illusions, and mood. (Tabor's Cyclopedic Medical Dictionary, 17th Edition, 1993; attached as Exhibit A to Plaintiff's Response)

In contrast to the lack of clarity surrounding the meaning of organic brain syndrome, the reasons and justifications offered by defendant for its decision are clear. Defendant denied plaintiff additional long term disability benefits on the basis that plaintiff's disability was not due to organic brain syndrome and was instead due to plaintiff's primary diagnosis of major depressive disorder. (AR 156-160) In support of its decision, defendant cited to the reports of Dr. Topper and Dr. Becker in which those consulting doctors specifically concluded that plaintiff's disability was the result of recurrent major depressive disorder and not organic brain syndrome. (AR 175, 191-193) Moreover, defendant described other evidence in its letter while indicating why that evidence supported its decision. As noted by defendant, and as found in the administrative record, both Dr. Gabrial and Ms. DePalma identified plaintiff's primary diagnosis as depression or dysthymic disorder, and they treated plaintiff accordingly. (AR 556-559, 567, 570-571) Similarly, after he took over as plaintiff's treating psychiatrist, Dr. Quinn repeatedly identified plaintiff as suffering from major depression. (AR 486-488, 509, 512) Additionally, while treating plaintiff for plaintiff's symptoms of restless leg syndrome, mixed type headaches and fibromyalgia, Dr. Riess eventually concluded that plaintiff's symptoms were mostly due to depression and were psychiatric in nature. (AR 219-220, 232-234, 236) After a

-40-

Neuropsychological Evaluation, Dr. Kerner concluded that, while plaintiff had a number of conditions, the "severity and nature of the [plaintiff's] cognitive impairments is inconsistent with a mild traumatic brain injury and suggests that depression is a primary source of her functional difficulties" and that plaintiff's "primary issue appeared to be depression and a tendency to develop physical symptoms in response to stress."  (AR 333-334)

As detailed in defendant's letter, it's decision to deny plaintiff additional long term disability benefits was thorough and well-reasoned, and it should be affirmed.  Defendant detailed and discussed much of the medical evidence in the administrative record and it gave clear reasons why that evidence demonstrated that plaintiff's disability was due to depression and not organic brain syndrome.  In addition to examining the evidence, defendant relied on two separate and independent medical consultants, both of whom opined that plaintiff had been primarily treated for depression and was not disabled due to an organic brain syndrome.[5]  As discussed above, the arbitrary and capricious standard of review is "the least demanding form of judicial review of administrative action," Williams, 227 F.3d at 712, and the decision of a Plan

_____

[5]Plaintiff repeatedly notes that Dr. Topper and Dr. Becker were "hired" by defendant, but the Supreme Court has expressly held that courts reviewing ERISA appeals should not automatically assume that a physician's testimony is subject to a conflict of interest.  Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003) ("[C]ourts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.").  In so holding, the Supreme Court also noted that "the assumption that the opinions of a treating physician warrant greater credit than the opinions of plan consultants may make scant sense" because treating physicians may have a countervailing incentive to find patients disabled.  Black & Decker, 538 U.S. at 832.  Here, plaintiff offers no evidence of any evidence of an actual conflict of interest involving either Dr. Topper or Dr. Becker.

administrator should be affirmed if it is "rational in light of the plan's provisions," Daniel, 839

F.2d at 267, or "when it is possible to offer a reasoned explanation, based on the evidence, for a

particular outcome, that outcome is not arbitrary or capricious." Williams, 227 F.3d at 712.

Here, given the opinions of the medical consultants and the evidence cited in both those opinions

and defendant's letter denying additional benefits, defendant's decision was rational in light of

the Plan's provisions and it is possible to offer reasoned explanations for the decision.

Accordingly, defendant's decision was not arbitrary and capricious and it should be affirmed.

Plaintiff first argues that decision by defendant was arbitrary and capricious because

plaintiff's disability was due to a traumatic brain injury and a traumatic brain injury is an organic

brain syndrome that fits within the Plan's exclusion to the limitation on long term disability

benefits for mental disorders.  However, as discussed below, the evidence conflicts with respect

to whether plaintiff suffered a traumatic brain injury and whether plaintiff's disability was due to

any traumatic brain injury she did suffer.  Considering that conflicting evidence, as well as the

evidence supporting defendant's conclusion that plaintiff's disability was due to depression,

defendant's decision was not arbitrary and capricious.

Almost all of the medical professionals in the administrative record described plaintiff as

having suffered a traumatic brain injury.  For example, on April 26, 2005, Ms. DePalma issued a

Clinical Assessment indicating that plaintiff had been diagnosed with "mood disorder secondary

to traumatic brain injury" and "PTSD" among other physical ailments.  (AR 556-558)  Likewise,

the initial evaluation at Saint Joseph Mercy Rehabilitation Service for Speech (AR 654), Dr.

Gabrial's progress notes (AR 570-571), Dr. Kerner's Neuropsychological Evaluation (AR

333-334), Dr. Quinn's reports (AR 484-485, 459-460), Ms. Mingus' report (AR 495), Dr. Riess'

affidavit (AR 196-197), Dr. Becker's second report (AR 191-192), and Dr. Zhao's examinations

(AR 161-166) all indicate that plaintiff had suffered a traumatic brain injury.  Moreover, while

some of those reports merely state that diagnosis without any support, Ms. DePalma described

the diagnosis as having been made following reports by plaintiff of impaired memory and

diminished insight under stress, as well as observations of plaintiff demonstrating diminished

concentration, attention, and judgment under stress (AR 556), while Dr. Riess stated that his

conclusions were based on his own examinations and the results of plaintiff's

neuropsychological testing (AR 196-197).  Outside of opinions, the MRI performed on April 2,

2005, revealed scattered tiny foci of altered signal in cerebral white matter, which represented a

slight increase from February 4, 2004.  (AR 428.)

  However, other portions of the administrative record do not support the view that

plaintiff suffered a traumatic brain injury.  The emergency room records, as later described by

Dr. Kerner, suggest that plaintiff did not suffer a head injury or a traumatic brain injury as

plaintiff denied loss of consciousness, striking her head and had a good recall of the accident.

(AR 329)  Plaintiff was alert and oriented during her time in the emergency room, although she

did complain of a headache, and her neurological examination was normal with no reports of

nausea, vomiting, changes in speech, visual changes and/or other neurological/head injury

symptoms.  (AR 329)  Moreover, Dr. Riess' examinations repeatedly revealed that plaintiff's

"[m]ental status was within normal limits for speech, cognition, orientation, and memory." (AR

209, 213, 221, 234, 236, 238, 240, 242, 246)  Dr. Riess also noted that the abnormal MRI scan

-43-

could have been caused by multiple sclerosis (AR 228) and, at one point, Dr. Riess stated that plaintiff's memory loss could be a side effect of plaintiff's medication.  (AR 223)  Dr. Topper concluded that the "MRI findings do not demonstrate any evidence of traumatic brain injury" and that plaintiff did not require any memory rehabilitation, did not complain of any difficulties in everyday living situations regarding her memory, and the diagnosis of traumatic brain injury stated by the psychiatrist is claimant reported and is not based on any persuasive clinical or radiological evidence.  (AR 379)

Even if plaintiff did suffer a traumatic brain injury and a traumatic brain injury is an organic brain syndrome, the traumatic brain injury would still have to be the cause of plaintiff's disability, rather than plaintiff's depression, in order for the exclusion from the limitation on long term disability benefits to apply.  Here, every medical professional who identified plaintiff as suffering a traumatic brain injury also listed plaintiff as suffering from major depression (AR 164-166, 234-236, 329-334, 484-485, 495, 556-559, 570) and, as discussed above, the administrative record is replete with evidence supporting defendant's conclusion that plaintiff's disability was due to depression.  Moreover, while Dr. Riess' affidavit states that he was treating plaintiff for a traumatic brain injury and that it was the condition for which Dr. Riess disabled plaintiff from all physical and cognitive employment (AR 196-197), the letters he wrote during the course of his treatment of plaintiff reveal that Dr. Riess eventually concluded that plaintiff's symptoms were mostly due to depression and were psychiatric in nature.  (AR 219-220, 232-234, 236)

Plaintiff also argues in her motion and response that, despite the reasons given in the letter, defendant's decision was arbitrary and capricious given the opinions of plaintiff's treating physician.  A plan administrator is not required to accord special weight to the opinions of the plaintiff's treating physician, or to offer an explanation when it credits reliable evidence that conflicts with a treating physician's evaluation.  Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003); Calvert v. Firstar Finance, Inc., 409 F.3d 286, 293 (6th Cir. 2005) ("treating physician rule" does not apply in the ERISA context).  However, "[g]enerally speaking, a plan may not reject summarily the opinions of a treating physician, but must instead give reasons for adopting an alternative opinion."  Elliott v. Metropolitan Life Ins. Co., 473 F.3d 613, 620 (6th Cir. 2006).  See also Evans v. UnumProvident Corp., 434 F.3d 866, 877 (6th Cir. 2006) ( "[A] plan administrator may not arbitrarily disregard reliable medical evidence proffered by a claimant, including the opinions of a treating physician.") (citing, *inter alia*, Black & Decker, 538 U.S. at 833).  Additionally, where, as is the case here, the right to conduct a physical examination is specifically reserved in the Plan, a Plan's decision to conduct a file-only review "may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination."  Elliot, 473 F.3d at 621 (quoting Calvert, 409 F.3d at 296).

Here, while defendant chose to conduct a file-only review, it did not arbitrarily disregard the opinions of plaintiff's treating physicians and its decision should not be deemed arbitrary and capricious on that basis.  With respect to the issue in this case, *i.e.* whether plaintiff's disability was due to organic brain syndrome or depression, Dr. Riess was the only treating physician to

-45-

state an opinion that was rejected by defendant and, while there may be some support for Dr.

Riess' opinion in the administrative record, defendant's decision was supported by credible and

significant evidence.  Given the lack of a treating physician rule in ERISA cases, as well as the

opinions and evidence supporting defendant's determination, its decision did not arbitrarily

disregard the opinions of plaintiff's treating physicians and it should not be deemed arbitrary and

capricious on that basis.

Plaintiff further argues that defendant's decision conflicts with the SSA disability

determination that found plaintiff to be disabled.  While such a determination may be a factor in

the court's analysis, "an ERISA plan administrator is not bound by an SSA disability

determination when reviewing a claim for benefits under an ERISA plan."  Whitaker v. Hartford

Life and Acc. Ins. Co., 404 F.3d 947, 949 (6th Cir. 2005).

In this case, the SSA disability determination is largely irrelevant to the issue in dispute

here.  While the ALJ determined plaintiff to be disabled, it only found that plaintiff suffered

from a number of severe impairments, including depression and traumatic brain injury, and that

is was some combination of those impairments that caused plaintiff to be disabled.  Thus, the

SSA determination was that plaintiff was disabled, and not what caused the disability.

Moreover, even if the SSA disability determination could be seen as supporting plaintiff's

argument that she suffered a traumatic brain injury, that her disability was due to that traumatic

brain injury, and that a traumatic brain injury is an organic brain syndrome, the SSA

determination is not enough to render defendant's decision arbitrary and capricious given the

evidence supporting defendant's decision.

Therefore, defendant's denial of additional long-term disability benefits was not rendered arbitrary or capricious by the fact that the SSA had awarded plaintiff Social Security disability benefits.  At most, the Social Security Administrator's decision is only one factor for the court to consider and, in this case, the factor does not provide much support for plaintiff's position given the issue in dispute in this case, the number of severe impairments found by the ALJ, and all the evidence supporting defendant's decision.[6]

**V. Conclusion**

For the reasons stated above, the court recommends that plaintiff's motion be denied, defendant's motion be granted, and judgment entered in favor of defendant.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  Thomas v. Arn, 474 U.S. 140 (1985); Howard v. Secretary of HHS, 932 F.2d 505, 508 (6th Cir. 1991); United States v. Walters, 638 F.2d 947, 949-50 (6th Cir. 1981).  The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  Willis v. Secretary of HHS, 931 F.2d 390, 401 (6th Cir. 1991); Smith v. Detroit Fed'n of Teachers Local 231, 829 F.2d 1370, 1373 (6th Cir. 1987).

---

[6]Plaintiff's complaint also contained allegations that defendant breached its fiduciary duty and denied plaintiff procedural due process.  Plaintiff does not, however, address those claims in her motion or respond to any arguments made by defendant with respect to them.  Moreover, as argued by defendant, plaintiff is barred from pursuing equitable relief in this case because it is a claim challenging defendant's denial of benefits.  Wilkins v. Baptist Healthcare System, 150 F.3d 609, 615-616.

Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be no more than 20 pages in length unless, by motion and order, the page limit is extended by the court. The response shall address each issue contained within the objections specifically and in the same order raised.

S/Virginia M. Morgan
Virginia M. Morgan
United States Magistrate Judge

Dated: April 15, 2009

---

**PROOF OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record via the Court's ECF System and/or U. S. Mail on April 15, 2009.

s/Jane Johnson
Case Manager to
Magistrate Judge Virginia M. Morgan